UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

THOMAS MOORER,

           Plaintiff,

      v.

JOHN VALKNER, et al.,

           Defendants.

No. 18 CV 3796

Judge Manish S. Shah

MEMORANDUM OPINION AND ORDER

Plaintiff Thomas Moorer spent almost seven years in pretrial detention, accused of murdering Edward Ramos. A jury found him not guilty. He alleges that officers of the Chicago Police Department didn't have probable cause to detain him for the murder. There are gaps in the record as to how Moorer became a suspect; police officers lost the victim's cellphone; other evidence suggested that Moorer didn't commit the crime; and CPD officers and the state's attorneys relied on photo array and in-person lineup identifications that Moorer alleges were unreliable. Moorer brings claims for unlawful pretrial detention, false imprisonment, and spoliation of evidence against CPD officers and the City of Chicago. Defendants move for summary judgment. For the reasons that follow, their motion is granted.

## I. Legal Standards

Summary judgment is appropriate if the movants show that there is no genuine dispute as to any material fact and that they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists

if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). I construe all facts and draw all inferences in favor of Moorer, the nonmoving party. *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 377–78 (7th Cir. 2020). I need only consider the cited materials, but I may consider "other materials in the record." Fed. R. Civ. P. 56(c)(3).

## II.    Facts

### A.    The Shooting

Someone murdered Edward Ramos. [164] ¶¶ 30–33.[1] Around midnight on August 27, 2010, Edward, his brother Edwin Ramos, and three of his cousins—Miguel Velez, Walter Velez, and Eliezer Martinez—were at their shared basement apartment on the northwest side of Chicago. *Id.* ¶¶ 8–10.[2] The five men were getting ready to go to a club with three friends: Jacklyn Hernandez, Alina Kindelan, and Delia Rivera. *Id.* ¶ 9. Hernandez, Kindelan, and Rivera pulled up at the apartment

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except in the case of citations to depositions, which use the deposition transcript's original page number. The facts are largely taken from Moorer's response to defendants' joint Local Rule 56.1 statement, [164], and defendants' response to Moorer's statement of additional facts, [174], where both the asserted fact and the opposing party's response are set forth in one document. Any fact not properly controverted is admitted. N.D. Ill. Local R. 56.1(e)(3); *see Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). I disregard legal arguments in the statements of facts, *see Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006), and ignore additional facts included in response to the asserted fact that do not controvert the asserted fact. N.D. Ill. Local R. 56.1(e)(2). Both parties rely heavily on compound facts—combining multiple allegations—in violation of Local Rule 56.1. *See, e.g.*, [164] ¶¶ 99–100; [174] ¶ 61. Plaintiff also fails to properly controvert many of defendants' statements of facts, which are therefore admitted. *See* [164] ¶¶ 13, 21, 55, 57, 68, 75–76, 85, 93–98, 106, 115.

[2] For ease of reading, I refer to Edward Ramos, Edwin Ramos, Miguel Velez, and Walter Velez by their first names.

around 11:30 p.m. or just before midnight. *Id.* ¶ 10. Walter came outside to speak with his girlfriend, Hernandez, who was still in the car. *Id.* ¶ 11. Rivera and Kindelan began walking towards the apartment. *Id.* ¶ 12.

A man with the lower part of his face covered and dressed in black clothing stepped out from the gangway to the building. [164] ¶ 13. He brandished a gun and confronted Kindelan and Rivera. *Id.* ¶¶ 13–14. The two women backed away and the man followed, coming into an area lit by streetlights. *See id.* ¶¶ 14–15. The parties dispute whether the man removed his mask at this point, but agree that he told Kindelan and Rivera to go away. *Id.* ¶ 15. The man then forced Walter to the apartment door. *Id.* ¶¶ 16–17. Rivera and Kindelan got back in the car with Hernandez. *Id.* ¶ 18. When they saw a second man emerge from the gangway, the women drove away and Hernandez called 911. *Id.*

The first man held a gun to Walter's head and told him to knock on the apartment door. [164] ¶ 19. Two other men were also in the gangway. *Id.* Walter banged on the door. *Id.* ¶ 20. Martinez and Edward, inside the apartment's living room, looked through the peep hole and then Edward opened the door. *See id.* ¶¶ 21, 24. The masked man rushed into the apartment and began shooting. *Id.* ¶ 22. There was a struggle for the gun, and Edward and Martinez fell to the ground. *Id.* ¶¶ 22–23. The man, whose face was now uncovered, fired several shots while standing, hitting Martinez in the leg. *Id.* ¶ 23. Miguel had been ironing clothes in a bedroom. *Id.* ¶ 24. After he heard the shots, Miguel looked into the living room, saw Edward struggling with the man, and ran out the back door. *Id.* Edwin heard the struggle,

3

saw a man on top of Edward and Martinez, and ran to assist. *Id.* ¶¶ 25–26. The man hit Edwin in the head with the gun, but Edwin punched the assailant, causing the man to drop the weapon. *Id.*

Disarmed, the man ran out of the apartment the way he'd come. [164] ¶ 28. Edwin followed, but outside he saw a second man pointing a gun at him. *Id.* ¶ 29. The first man told his accomplice to start shooting. *Id.* Edwin lunged backwards into the doorway while Edward came past him, into the line of fire. *Id.* ¶ 30. Edward was shot in the chest. *See id.* ¶ 32. The man and his two accomplices fled. *Id.* ¶ 31. Edwin, Martinez, Miguel, and Walter carried Edward to a car, and Edwin drove his brother and Martinez to a hospital. *Id.* ¶¶ 32–33. Edward died later that night. *Id.* ¶ 33.

### B. Initial Investigation and Photo Array

Officers of the Chicago Police Department arrived at the scene minutes after the shooting. [164] ¶ 34. Detectives Timothy McDermott, Matthew Benigno, and Steven Becker were assigned to the case. *Id.* ¶¶ 3, 37. They canvassed the area while forensic investigators gathered physical evidence. *Id.* ¶¶ 37–47. At a police station, other CPD officers—detectives Brian Tedeschi, John Valkner, Emiliano Leal,

Nicholas Spanos,[3] and Tracy Fanning[4]—began interviews with Edwin, Miguel, Walter, Hernandez, Kindelan, and Rivera. *Id.* ¶¶ 3, 48. The witnesses were separated and their interviews were conducted individually. *Id.* ¶ 49.[5]

In general,[6] the six witnesses described the initial shooter as a Black man wearing jeans, a mask of some sort on the lower half of his face, between twenty-five

---

[3] To show individual liability under § 1983, Moorer must allege that each of the individual defendants was personally involved in the constitutional deprivation. *See Johnson v. Rimmer*, 936 F.3d 695, 710–11 (7th Cir. 2019) (citing *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017)). Personal involvement means (1) participating directly in the alleged violation; (2) knowing about the conduct; (3) facilitating the conduct; (4) approving the conduct, condoning it, or turning a blind eye to it. *Rasho v. Elyea*, 856 F.3d 469, 478 (7th Cir. 2017) (citations omitted). Moorer concedes that defendants Benigno's, Becker's, and Spanos's involvement in any alleged wrongdoing was minimal and that they should be dismissed from the case. [163] at 49. Based on that concession, and the failure to present evidence from which a jury could reach a verdict in Moorer's favor on any of his claims against Benigno, Becker, and Spanos, those defendants are entitled to judgment as a matter of law.

[4] Moorer argues that Fanning was personally involved in the violation of his rights because Fanning interviewed a witness who had difficulty seeing the crime and minimally described the offender, but Fanning didn't question the witness's reliability. *See* [163] at 48. But just because the witness was inconsistent or unreliable doesn't mean Fanning was required to discredit her statements. *See Woods v. City of Chicago*, 234 F.3d 979, 997 (7th Cir. 2000). The facts show that Fanning was minimally involved in the investigation and wasn't personally involved in the alleged wrongdoing. Summary judgment is granted to Fanning.

[5] Plaintiff denies that the witnesses were separated at the police station, [164] ¶ 49, but the portion of trial testimony Moorer cites in response to this fact does not support the proposition that the witnesses spoke with one another at the police station before their initial interviews with detectives. *See* [154-3] at 207–08. Defendants' statement of fact isn't fully supported because deposition testimony from Hernandez, Kindelan, and Miguel indicates only that their interviews were conducted separately, not that they didn't discuss their interviews after they took place. *See* [154-24] at 36–37, 70–71; [154-25] at 34–35; [154-26] at 42. The fact is otherwise admitted.

[6] Martinez gave a statement at the hospital at 1:10 a.m., and described the initial shooter as being a dark-skinned Black man with the lower portion of his face covered, twenty-four to twenty-six years old, five foot ten inches to five foot eleven inches tall, and 180-190 pounds. [174] ¶¶ 3–4. Edwin spoke to detective Valkner at 1:30 a.m., and said that the first shooter was a Black man in his thirties, six foot to six foot three inches tall, about 250 pounds, and wore a dark shirt, blue jeans, tan boots, and that the lower portion of his face was covered by a mask, bandana, or shirt that came off during the struggle. *Id.* ¶ 7. Hernandez gave a statement to detective Tedeschi at the station at 1:30 a.m. *Id.* ¶ 13. She described the first

and thirty-six years old, five foot ten to six foot three inches tall, and weighing between 180 and 250 pounds. *See* [174] ¶¶ 3–4, 7, 13, 16, 19, 21, 23; [164] ¶ 50.[7] With the exception of Kindelan's interview with detective Leal, which wasn't similarly documented, the detectives summarized the witnesses' interviews in general progress reports. [164] ¶¶ 51–52.

At 1:30 in the morning on August 28, detective Valkner interviewed Edwin. [174] ¶ 7. Edwin said that he recognized the man who entered the apartment. [164] ¶ 53; [174] ¶¶ 7–8, 24. He said that his brother had sold drugs to the man, who went by the nickname, "Boom," and that a dispute had arisen over an unpaid debt. *See* [164] ¶ 53; [174] ¶¶ 8, 24. Edwin said that he had seen Boom on two earlier occasions, and that Boom made threatening phone calls to his brother during the week before

---

shooter as a Black man wearing black clothing. *Id.* Walter spoke with detective Valkner at 2:00 a.m., and described the first shooter as a Black man, thirty-five to thirty-six years old, with a medium dark complexion, wearing a black shirt, jeans, and a mask on the lower half of his face. [174] ¶ 16. Rivera was interviewed by detective Fanning at 2:00 a.m., and, while indicating that she didn't seem him very well, described the first shooter as a dark-skinned Black man, twenty-five years old, fat, with short dreadlocks, a white t-shirt, dark pants, and a mask on his face. *Id.* ¶ 19. Kindelan gave a statement at 2:10 a.m. to detectives Leal and Spanos, describing the assailant as a Black man, twenty-five to thirty-five years old, six foot tall, 250 pounds, wearing a black shirt over his face. *Id.* ¶ 21. Miguel spoke to detective Tedeschi at 2:10 a.m., and described the first shooter as a Black man, five foot eleven inches to six foot tall, and approximately 230 pounds. *Id.* ¶ 23.

[7] Plaintiff's statements of fact describe numerous inconsistencies between the eyewitnesses' initial and subsequent descriptions of the shooter. *See* [174] ¶¶ 5, 13–23. Two subsequent statements that Martinez gave differed from his initial statement to police officers. *Id.* ¶ 5. In one, Martinez said he was able to see the offender's face because the mask had come off. *Id.* In a videotaped interview and later at trial, Hernandez said that she told the police that the shooter was "big." *Id.* ¶ 14. In a deposition, Hernandez said that she told officers she had never seen the man's unmasked face, which contradicted her trial testimony. *Id.* ¶ 15. Rivera testified at trial that she told detectives that the shooter was tall, Black, and big. *Id.* ¶ 20. In Kindelan's videotaped statement, she described the shooter as dark, huge, and tall and said that she did not see the man with a gun. *Id.* ¶ 22. Because this case is about whether the officers had probable cause, I consider only the evidence that bears on what the officers knew at the time they initiated Moorer's detention.

6

the shooting. [164] ¶ 54; [174] ¶ 8. Edwin told detectives that they could find Boom's contact information in Edward's cell phone. [164] ¶ 54; *see* [174] ¶ 9.

A cell phone was recovered at the scene of the crime. [164] ¶ 42. A forensic investigator collected and transported physical evidence to his office, *id*. ¶ 46, but detective McDermott requested that the investigator turn over the cell phone to him rather than inventory it. *Id*. ¶ 47; [174] ¶ 66. The investigator gave the phone to McDermott. [164] ¶ 47; [174] ¶ 66. Having finished his work at the scene, McDermott returned to the police headquarters at around 4:20 a.m. [164] ¶ 69. While McDermott said that he or someone else should have documented and inventoried the phone, it was never inventoried, and the record is silent as to what became of it after the investigator gave the phone to McDermott. [174] ¶ 67; [164] ¶ 71.

But police reports show that Edwin identified a cell phone as belonging to his brother, and that Edwin and Valkner searched the contacts of the phone and located an entry for "Boom" associated with the number (773) 754-2075. [174] ¶ 9; [164] ¶ 70. Later, however, Edwin said that he assumed his brother's phone had been password-protected, couldn't remember going through the contacts in Edward's phone with detectives, and didn't know what happened to Edward's cellphones after the "incident." [174] ¶ 10. Valkner couldn't remember looking at a phone with Edwin or who had given him the phone. [174] ¶¶ 11, 68.[8]

---

[8] Moorer's allegations turn both on how Moorer became a suspect and on the missing cellphone. He claims that Edwin was coerced into identifying Moorer's photograph, and that the officers, knowing that Moorer wasn't involved in the murder, destroyed Edward's cellphone. *See* [163]. Since Valkner conducted the pivotal interview with Edwin and may have searched the missing cellphone, a jury could find that Valkner personally participated in the alleged violations.

A CPD officer ran a nickname search for "Boom" in a database. [164] ¶ 55; *see* [174] ¶ 24.[9] Detective Gonzalez said that the database search turned up a photograph of Thomas Moorer which was then put into a photo array, *see* [174] ¶ 24; [164] ¶¶ 55–56; [165-15] at 10, but couldn't remember which detective ran the search, how many results the search returned, or how Moorer's photograph was chosen from among the results. [174] ¶ 25. Detectives McDermott, Cardo, and Valkner also couldn't remember which officer made the database search. *Id.* ¶ 28. When Moorer's public defenders made a search for Boom in the same database six years later, they turned up nearly 200 results, including Moorer. *Id.* ¶ 26; *see* [165-16] at 3.

Detectives gave Edwin two books or "a bunch of papers" that included the photographs of six people on each page. *See* [164] ¶ 56; [174] ¶ 31.[10] Moorer's photograph was included. *See* [164] ¶ 56. When that picture was taken, Moorer weighed between 235 and 245 pounds, which was significantly more than the 180 pounds that he weighed in August 2010. *See* [174] ¶ 1; [165-44] at 2. After looking at the photographs for twenty to thirty minutes, Edwin identified Moorer as having been involved in the shooting. *See* [164] ¶ 56.[11] Detectives then stepped out of the room

---

[9] The testimony cited by both parties supports the fact that a CPD officer searched the police database for the name Boom, but does not mention how many results were generated by the search. *See* [154-7] at 35–36; [154-17] at 72–76; [154-18] at 15–16; [165-15] at 11. Plaintiff does not properly controvert the fact that the nickname search was performed by a CPD officer. *See* [164] ¶ 55. That detectives did not recall personally searching the system and couldn't remember which particular officer had made the search does not controvert the fact that the search was performed by a CPD officer. The fact is admitted.

[10] The parties dispute the precise form of the initial mugshot printouts that Edwin viewed, but that dispute is immaterial.

[11] Moorer alleges that it's not known how he came to be a suspect in the first place, *see* [174] ¶¶ 28, 93, but the record doesn't fully support that allegation. After Edwin gave CPD the

and returned with a printout including Moorer's image. *See* [174] ¶ 32. The detectives asked Edwin to confirm his identification, and had him circle the picture of Moorer and sign his name under the image. *See* [174] ¶ 32.

An unknown CPD officer created a photo array of six photographs, including Moorer's. *See* [164] ¶¶ 58–59; [154-36]; [154-37]. Detective Tedeschi logged into the CPD's mug shot database, used to create photo arrays, and performed his first command at 1:30 a.m. [164] ¶ 57. The computer system could create photo arrays in several ways: based on a suspect's mugshot, demographic information, or by inputting a specific name or identifying number. [174] ¶¶ 34–35. It generally took ten to twenty minutes to put together a photo array. *Id.* ¶ 42. Once created, a photo array could be saved, but if it was not, there was no way to tell whether the system generated a photo array. *Id.* ¶ 35. Tedeschi said that he didn't believe he had made the array in this case. *Id.* ¶ 42. No one saved the photo array including Moorer in the system, *see id.* ¶ 36, but paper copies of the array were preserved. *See id.*; [164] ¶ 58; [154-36]; [154-37].

In the photo array, Moorer's photograph appears in the middle position of the bottom row, and the fillers appear to be the same race and sex as Moorer. [164] ¶ 59;

___

name Boom, a CPD officer ran a search in a database, someone produced photographs associated with that search, and from those photographs Edwin identified Moorer as a person involved in the shooting. *See* [164] ¶¶ 55–56; [174] ¶ 24; [165-15] at 10–11. That the computer search and resulting printouts that Edwin saw weren't saved, and that it's not clear which officer performed the search, does not mean that it's unknown how Moorer came to be a suspect.

*see* [154-36].[12] Moorer was not moved from that position in any photo array. [174] ¶ 88. Hernandez, Edwin, Kindelan, Rivera, and Miguel viewed the photo array that included Moorer's photograph: Hernandez viewed the array at 1:35 a.m.; Edwin at 2:00; Kindelan at 2:30; Rivera at 2:37; and Miguel at 3:30. [164] ¶ 67. Before seeing the array, each witness separately signed an advisory form, which said that a suspect wouldn't necessarily be in the spread and that the witness wasn't required to make an identification. *Id.* ¶¶ 61–63. At no time were the witnesses told who to identify, or where Moorer was in the array. *Id.* ¶ 65.[13] Hernandez later said that officers told her to "pick out who I seen." [164] ¶ 64. All five witnesses positively identified Moorer as being involved in the home invasion. *Id.* ¶ 68.[14] Hernandez, Edwin, and Miguel confirmed with detective Tedeschi that they were 100 percent certain in their identifications. *Id.* After Kindelan identified Moorer, detective Leal circled Moorer's

---

[12] Plaintiff disputes whether the fillers were the same weight as Moorer, and whether they shared the same hair style. [164] ¶ 59. I discuss the array in more detail below.

[13] As noted above, after Edwin initially identified Moorer's photograph, he was asked to confirm his identification on a separate print out. *See* [174] ¶ 32. It's not clear whether Edwin also viewed a separate photo array or if the separate print out was the photo array itself.

[14] Plaintiff doesn't properly controvert defendants' compound fact that Hernandez, Edwin, Miguel, Rivera, and Kindelan identified Moorer as being involved in the crime, and so that fact is undisputed and admitted. *See* [164] ¶ 68. Moorer's response includes numerous additional facts that speak to the unreliability and inconsistency of the witnesses' identifications, but a response to an asserted fact may not set forth new facts that aren't fairly responsive to the asserted fact. N.D. Ill. Local R. 56.1(e)(2). That the witnesses' identifications were inconsistent with their earlier or subsequent statements does not controvert the fact that the witnesses made the identifications, and so I ignore Moorer's additional, unresponsive facts about what the witnesses said they could see or had seen on the night of the murder.

photograph on Kindelan's copy of the array in order to verify Kindelan's identification. *See* [164] ¶ 66; [154-15] at 32–33.[15]

After returning to the station at 4:20 a.m., detective McDermott called Assistant State's Attorney Maria Augustus. [164] ¶¶ 69, 72. Augustus came to the station where she was briefed on the investigation, reviewed police reports, and reinterviewed witnesses with McDermott. *Id.* ¶ 73. After the interviews, at 7:50 a.m., McDermott and Augustus mutually agreed to issue an investigative alert with probable cause to arrest Thomas Moorer. *Id.* ¶¶ 75–76; [174] ¶ 43. McDermott didn't pressure Augustus to issue the alert or recommend charges. [164] ¶ 76.

### C.    Moorer's Arrest and the In-Person Lineups

McDermott's shift ended, and detectives Cardo and Gonzalez took over the investigation. [164] ¶ 77. The detectives went to Moorer's last known address and set up surveillance. *Id.* ¶ 79. At about 3:25 p.m. on August 28, Moorer left his house and got into a car. *Id.* ¶ 80; [174] ¶ 45. Police officers stopped the vehicle, and Moorer was taken into custody and brought to the police station. [164] ¶ 80; [174] ¶ 45. Moorer agreed to speak with detectives. [164] ¶ 81; [174] ¶¶ 53, 55. He denied being involved in the crime and said that he had been home the day of the shooting with his sisters and his sisters' children. [164] ¶ 82; [174] ¶¶ 53, 55.

---

[15] Plaintiff argues that Leal was personally involved in the violation of his Fourth Amendment rights because Leal circled Moorer's picture in the photo array after Kindelan identified Moorer. [163] at 48. But it's not reasonable to infer from the fact that Leal circled Moorer's picture *after* Kindelan identified Moorer that Leal coached the witness into making an identification, and the undisputed facts show that Leal was minimally involved in the investigation and wasn't personally involved in the alleged constitutional deprivation. *See Johnson v. Rimmer*, 936 F.3d 695, 710–11 (7th Cir. 2019). Leal is entitled to summary judgment on Moorer's § 1983 claim.

Cardo and Gonzalez learned that Moorer's nickname was "Boomer," rather than Boom. [174] ¶ 48. The detectives didn't see any injuries on Moorer's body or blood on his clothing or his person, *see id.* ¶ 52, officers tracked the phone associated with Boom at locations that were different from where Moorer's vehicle and home were, *id.* ¶¶ 44, 46, and Moorer's car didn't match the description of the vehicle seen leaving the crime scene. *Id.* ¶ 54. Moorer didn't own a cell phone, didn't have one in his possession when he was arrested, and police officers never found a connection between Moorer and the number for Boom. *Id.* ¶ 47. Officers never secured a search warrant or asked to search Moorer's home. *Id.* ¶ 95.

Cardo and Gonzalez called Edwin, Miguel, Walter, Kindelan, Hernandez, and Rivera, and asked them to return to the station to view an in-person lineup. [164] ¶ 83. Some of the witnesses sat together at the police station before viewing the in-person lineup. *See* [174] ¶ 89. Cardo and Gonzalez assembled the lineup, including Moorer and four other individuals selected from lockups in the area. [164] ¶¶ 84–85; *see* [154-38]. Moorer was the only person in the photo array and the live lineup, and was not placed in different positions during the lineup. [174] ¶ 88. All of the lineup participants appeared to be Black men. [164] ¶ 85.[16] The lineup participants wore civilian clothes, and Moorer wore clothing different from that which the shooter was wearing at the time of the home invasion. *Id.* ¶ 86. Before viewing the lineup,

---

[16] The testimony defendants cite does not show that the lineup participants had approximately the same height, weight, and age. The testimony is that the detectives attempted to secure a lineup with those characteristics. *See* [164] ¶ 85; *see* [154-17] at 94; [154-18] at 69.

12

Gonzalez met separately with each witness and asked them to read and sign an advisory form. *Id.* ¶ 87. The witnesses read and signed the forms, *id.* ¶ 88, and then viewed the lineup independently of one another and waited in separate rooms until all of the witnesses had finished viewing the lineup. *Id.* ¶¶ 89–90.

Walter viewed the lineup first, identified Moorer, but was only eighty percent certain. [164] ¶ 92. Detective Gonzalez treated his lack of confidence as a negative identification. *Id.* Rivera went next and identified Moorer as the person she had seen with a gun. *Id.* ¶ 93. Edwin identified Moorer right away. *Id.* ¶ 94. Edwin also thought that another man present at the attack was in the lineup, but detectives told him to ignore that other man and focus only on the man who entered the apartment. *Id.*; [154-22] at 41. Hernandez and Kindelan identified Moorer as the person they had seen in the gangway. [164] ¶¶ 95–96. Miguel viewed the lineup later on the evening of August 28th, and positively identified Moorer as the man whom he seen wrestling with Edward. *Id.* ¶ 97.[17] According to Gonzalez, with the exception of Walter, none of the other witnesses expressed any doubt in their identifications of Moorer. *Id.* ¶ 98.

---

[17] In response to the in-person lineup identifications by Rivera, Hernandez, Kindelan, and Miguel, plaintiff offers additional facts about the reliability and consistency of their identifications, but those facts don't controvert the identifications themselves. *See* [164] ¶¶ 93–97. Moorer notes that Rivera described the shooter as having dreadlocks, even though Moorer didn't at the time she viewed the lineup. *Id.* ¶ 93. Hernandez said that she had never seen the lower part of the shooter's face but still identified Moorer. *Id.* ¶ 95. Kindelan said she didn't see anyone holding a gun, but identified Moorer as having held one during the crime. *Id.* ¶ 96. Miguel said that he hadn't seen the shooting but identified Moorer as having shot a gun. *Id.* ¶ 97. Miguel also said when detectives called him into the station to view the lineup, they told Miguel that a suspect was in custody, and they had arrested the person he had identified from the photo array. *Id.* ¶ 88 These facts don't respond to the identifications themselves: they cast doubt on the reliability and consistency of the witnesses' perception, but do not controvert the facts that the identifications were made. *See* N.D. Ill. Local R. 56.1(e)(2). There is no dispute that the witnesses selected Moorer. The facts are admitted.

13

Assistant State's Attorney Augustus reinterviewed Edwin, Miguel, Walter, Hernandez, Kindelan, and Rivera. [164] ¶ 99. The six witnesses gave videotaped statements of their accounts of what happened during the home invasion. *Id*. The witnesses confirmed that they had read and understood the lineup advisory forms and that they had positively identified Moorer in the photo array, physical lineup, or both. *Id*. ¶ 100.[18] The witnesses said that officers had not threatened them or made promises, and that they gave their statements freely and voluntarily. *Id*. ¶ 101.

On August 29, Martinez was released from the hospital and came to the police station to view a physical lineup. [164] ¶ 102. He had not viewed the photo array. *See* [164] ¶¶ 67–68, 102; [174] ¶ 88. Detectives Cardo and Gonzalez assembled another physical lineup, including Moorer and four "fillers." *Id*. ¶ 103. Moorer was placed in a different position in this lineup than he had been in the previous one. [174] ¶ 88. The parties agree that all of the subjects in the lineup appeared to be Black men of approximately Moorer's age, but dispute whether they were the same approximate height and weight. [164] ¶ 104. Martinez read and signed the advisory form before viewing the lineup. *Id*. ¶ 105. Martinez viewed the lineup and identified Moorer as the person who struggled with Edward and subsequently shot and killed him. *Id*. ¶ 106.[19]

---

[18] The records cited by defendants in this compound fact do not support the idea that the witnesses' statements were consistent with their earlier statements, since defendants only cite one statement by each witness. *See* [164] ¶ 100. Moorer's response doesn't controvert the fact that the witnesses read and signed the advisory forms and confirmed their identifications, and so that fact is admitted.

[19] Moorer disputes that Martinez viewed the lineup and identified Moorer, but plaintiff's response doesn't controvert the asserted fact. *See* [164] ¶ 106. That Martinez said Moorer had

That night, detectives investigated Moorer's claim that he had been home during the time of the shooting. [164] ¶ 107; [174] ¶ 57. In his initial interview with detectives, Moorer told Gonzalez to call a woman who would confirm his whereabouts, and it's reasonable to infer that Moorer meant police officers should speak to his girlfriend. *See* [174] ¶ 56.[20] Detectives McDermott and Folino went to Moorer's residence. [174] ¶ 57; [164] ¶ 107. Moorer's girlfriend, Lakisha Shorter, answered the door, but the detectives didn't interview her. [174] ¶ 57. In depositions taken later, Shorter and Tierra Moorer said that Moorer was with them at the party at the time of the murder. [174] ¶ 62.

At Moorer's home, McDermott and Folino spoke to Vaneglen Moorer and Jeanetta Nobles. [174] ¶ 58; [164] ¶¶ 107–110.[21] Vaneglen said that she was with Moorer on the day of the shooting, and that he attended a party that was on the first floor of their home. *See* [164] ¶ 108; [174] ¶ 58. But Vaneglen said that she had periodically left the party to be with her sleeping children, and that there were times that night when she didn't see Moorer. [164] ¶ 109; [174] ¶ 58. Nobles said that she was upstairs but heard several people playing music downstairs. [164] ¶ 110. Nobles

---

an injury to one his arms that wasn't in the photographs of Moorer at the time of his arrest doesn't controvert the identification itself. The fact is admitted.

[20] The cited portions of Moorer's interview with detectives don't show that Moorer told officers to speak to his girlfriend, merely to an unnamed woman who would confirm his whereabouts on the night of the shooting. *See* [154-33] at 36. But Moorer referred to his girlfriend earlier in his interview, *see id.* at 34, and it's reasonable to infer that Moorer wanted police officers to speak to her to confirm his alibi.

[21] For ease of reading I refer to Vaneglen Moorer by her first name and plaintiff Thomas Moorer by his last.

was asleep from 10 p.m. on August 27 to 2 a.m. on August 28, and didn't see Moorer during that period. *Id.* ¶ 110.[22]

At some point after their interviews at Moorer's residence, Vaneglen and Nobles were taken to the police station. [164] ¶ 111; *see* [174] ¶ 60. The parties dispute whether Vaneglen had a choice to go to the police station or not. *See* [174] ¶ 61; [164] ¶ 113.[23] Vaneglen and Nobles spoke to ASA Augustus, and detective Frank Szwedo was also present. [164] ¶ 111; *see* [174] ¶ 60. Early in the morning on August 30, Vaneglen and Nobles signed written statements at the station. [164] ¶ 112; [174] ¶ 60. Their statements largely agreed with what they told detectives the day before. *See* [164] ¶ 112; [174] ¶ 61; [165-40] at 3. Vaneglen and Nobles were not promised anything in exchange for cooperating with the investigation. [164] ¶ 113.[24]

---

[22] Plaintiff argues that detective Folino was personally involved in the deprivation of his rights because Folino was present at the interviews of Vaneglen and Nobles but didn't speak to other witnesses about Moorer's whereabouts at the time of the shooting. *See* [163] at 48. But while an officer can't ignore conclusive evidence of an alibi, the Fourth Amendment doesn't require officers to investigate the validity of an affirmative defense. *See Dollard v. Whisenand*, 946 F.3d 342, 355 (7th Cir. 2019). Here, there wasn't conclusive evidence of Moorer's alibi: defendants weren't required to take Moorer's word for it, and Folino had no duty to talk to every person in Moorer's house in order to verify plaintiff's whereabouts. The facts show that Folino's involvement in the investigation was minimal, and Moorer hasn't shown that Folino was personally involved in the deprivation of his constitutional rights. *See Johnson v. Rimmer*, 936 F.3d 695, 710–11 (7th Cir. 2019). Folino is entitled to summary judgment on the § 1983 claim.

[23] The record cited by plaintiff doesn't support the allegation that Vaneglen was told she had to go to the police station, but Vaneglen did testify to that effect elsewhere. *See* [165-46] at 119.

[24] Moorer argues that Szwedo was personally involved in the violation of his rights because Szwedo was present when Vaneglen and Nobles were interviewed at the station and knew of other alibi witnesses but failed to interview them. *See* [163] at 48. But Szwedo's failure to interview alibi witnesses didn't violate Moorer's rights, *see Jackson v. City of Peoria, Illinois*, 825 F.3d 328, 330 (7th Cir. 2016) (citations omitted), and his involvement in the case began and ended with the interviews of Vaneglen and Nobles. Szwedo wasn't personally involved

### D.     The Grand Jury, Pretrial Detention, and Acquittal

At 12:15 a.m. on August 30, Augustus approved three felony charges against Moorer: first degree murder, attempted murder, and aggravated battery with a firearm. [164] ¶ 114; [174] ¶ 59. McDermott, Gonzalez, and Cardo said that they didn't pressure or lie to Augustus in order to coerce her into approving the charges. [164] ¶ 115.

In September 2010, a grand jury heard testimony from Vaneglen and Nobles, along with Edwin, Miguel, Rivera, Kindelan, and Hernandez. *Id*. ¶¶ 116–19. The state introduced the advisory forms and photo arrays documenting the witness identifications of Moorer. *Id*. ¶ 119. The grand jury returned a 135-count indictment charging Moorer with first-degree murder, among other crimes. *Id*. ¶ 120.

As part of its pretrial preparations, the state conducted testing on the physical evidence from the crime and studied the phone records of the number associated with Boom. [164] ¶¶ 121–22. Investigators compared Moorer's DNA to samples found at the crime scene. *Id*. ¶ 121; [174] ¶ 65. A brown hat found at the scene had DNA from two profiles, but neither matched Moorer. [174] ¶ 65. Similarly, Moorer was excluded as a match for DNA found on two pieces of black cloth, a portion of a collar, and a t-shirt. *Id*. The state subpoenaed phone records for the number associated with Boom and hired an expert to analyze cell tower information to determine the phone's location at the time of the shooting. [164] ¶ 122. The expert was unable to determine

---

in the alleged violation of Moorer's rights, and so he is entitled to summary judgment on the § 1983 claim.

where the phone had been located during the shooting because it had been turned off. *Id*. ¶ 123. The expert was able to determine that the records were inconsistent with the phone being used near Moorer's home on August 27 or 28, 2010. *Id*. The phone number associated with Boom continued to be used after Moorer was arrested. *See* [174] ¶ 12. One of the prosecutors in Moorer's trial later said that the cell phone could have contained exculpatory evidence. *Id*. ¶ 92.

Four years after Moorer's arrest, the city fired detective McDermott because he appeared with another CPD officer in a photograph with an African American man, posing as if McDermott were a hunter and the man was his prey. [174] ¶ 105.[25] The Police Board determined that McDermott impeded CPD's efforts to achieve its policy and goals, discredited the department, and disrespected the unidentified African American man in the photograph. *Id*.

Moorer's criminal trial was held in July 2017, almost seven years after his pretrial detention started. [164] ¶ 127. Edwin, Martinez, Miguel, Hernandez, Rivera, and Kindelan testified for the prosecution and reaffirmed their identifications of Moorer as one of the shooters. *Id*. ¶ 128. A professor of psychology testified for the

---

[25] The circumstances of McDermott's termination may bear on his character for truthfulness because they suggest a potential bias. *See* Fed. R. Evid. 608. That said, this fact can't help Moorer at this stage of the case because credibility is not assessed at summary judgment, and none of the undisputed facts depend on McDermott's credibility. *See Lisle v. Welborn*, 933 F.3d 705, 716 (7th Cir. 2019) (citing *Palmer v. Franz*, 928 F.3d 560, 565 (7th Cir. 2019)). Plaintiff also offers facts about two other lawsuits involving McDermott and detective Folino, *see* [174] ¶¶ 103–104, but those allegations are inadmissible character evidence because they are relevant only insofar as they make it more likely that the officers acted similarly in this case. *See* Fed. R. Evid. 404(b); *United States v. Gomez*, 763 F.3d 845, 855 (7th Cir. 2014).

defense that the photo array and live lineups including Moorer weren't reliable. *Id.* ¶¶ 130–31.[26]

The jury found Moorer not guilty on all counts. [164] ¶ 134. Ten months later, Moorer filed this lawsuit. [1].

## III.    Analysis

### A.    Fourth Amendment: Unlawful Detention

The Fourth Amendment to the Constitution protects "[t]he right of the people to be secure in their persons ... against unreasonable searches and seizures." U.S. Const. amend. IV. A seizure, including pretrial detention, is reasonable only if it was based on probable cause to believe the detainee had committed a crime. *See Lewis v. City of Chicago*, 914 F.3d 472, 476 (7th Cir. 2019) (citation omitted). The Fourth Amendment governs both detentions that happen before legal process and pretrial detentions that occur after legal process. *See Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 919 (2017); *see also Kuri v. City of Chicago*, 990 F.3d 573, 575 (7th Cir. 2021).

---

[26] Moorer alleges a series of facts drawn from a report prepared by this same expert, *see* [174] ¶¶ 70–80; from a report by a second witness, a lawyer and retired police officer, *see id.* ¶¶ 81–96; and from deposition testimony of a third expert, another professor of psychology. *See id.* ¶¶ 97–102. These experts cast doubt on the reliability of the identifications in the case, note the non-identification evidence that pointed away from Moorer, opine that the missing cell phone was possibly exculpatory, and conclude that defendants didn't follow proper procedures in various ways. *See* [174] ¶¶ 70–102. The experts' opinions are more than a "bottom line," *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996) (quoting *Mid-State Fertilizer Co. v. Exch. Nat'l Bank*, 877 F.2d 1333, 1339 (7th Cir. 1989)), and are at least minimally relevant here because they address flaws in the investigation that could undermine defendants' probable cause to detain Moorer. *See Williamson v. Curran*, 714 F.3d 432, 444 (7th Cir. 2013). However, that expert witnesses found the identifications in this case to be unreliable or suggestive is not conclusive because whether probable cause existed based on the undisputed facts at summary judgment is a question of law. *See United States v. Ellis*, 499 F.3d 686, 688 (7th Cir. 2007) (quoting *Smith v. Lamz*, 321 F.3d 680, 684 (7th Cir. 2003)).

Unlawful pretrial detention occurs when either "the police hold someone without any reason before the formal onset of a criminal proceeding," or when "legal process itself goes wrong—when, for example, a judge's probable-cause determination is predicated solely on a police officer's false statements." *Manuel*, 137 S. Ct. at 918.

Probable cause is an absolute bar to a claim for unlawful detention. *See Burritt v. Ditlefsen*, 807 F.3d 239, 249 (7th Cir. 2015) (quoting *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006)). Probable cause exists if the facts and circumstances within the arresting officer's knowledge would allow a prudent person to believe that the suspect had committed or was committing an offense. *Camm v. Faith*, 937 F.3d 1096, 1105 (7th Cir. 2019) (quoting *Gower v. Vercler*, 377 F.3d 661, 668 (7th Cir. 2004)). Probable cause is assessed objectively, based on the conclusions that the arresting officer reasonably might have drawn from information known to him. *Young v. City of Chicago*, 987 F.3d 641, 644 (7th Cir. 2021) (citations omitted).

A grand jury indicted Moorer, [164] ¶ 120, and that's prima facie evidence of probable cause. *Coleman v. City of Peoria, Illinois,* 925 F.3d 336, 351 (7th Cir. 2019) (citing *Wade v. Collier*, 783 F.3d 1081, 1085 (7th Cir. 2015)). The presumption of probable cause after a grand jury has indicted a defendant can be rebutted by "evidence that law enforcement obtained the indictment through improper or fraudulent means." *Id.* (citations omitted). In other words, Moorer must show that defendants knew that there was no probable cause to seize him or intentionally or recklessly provided false information to the grand jury. *See id.* (citing *Williamson v. Curran*, 714 F.3d 432, 444 (7th Cir. 2013)); *Olson v. Champaign County, Ill.*, 784 F.3d

20

1093, 1100 (7th Cir. 2015) (citations omitted) (officers act unreasonably if they intentionally or recklessly provide false information).

A single identification from a credible eyewitness is sufficient for probable cause. *Hart v. Mannina*, 798 F.3d 578, 587 (7th Cir. 2015) (citing *Woods v. City of Chicago*, 234 F.3d 979, 996 (7th Cir. 2000)); *Phillips v. Allen*, 668 F.3d 912, 915 (7th Cir. 2012) (citations omitted) ("Identification by a single eyewitness who lacks an apparent grudge against the accused person supplies probable cause for arrest."). But to establish probable cause, police officers can't rely on identifications that are the product of "coercion or manipulation." *Hart*, 798 F.3d at 587 (citing *Phillips*, 688 F.3d at 917). Moorer wants the eyewitness identifications in his case to be assessed using the two-step process used in the Due Process context, *see* [163] at 36, but that is not the test for probable cause under the Fourth Amendment. *See Phillips*, 688 F.3d at 915; *Coleman v. City of Peoria, Illinois,* 925 F.3d 336, 347–48 (7th Cir. 2019). Instead, to show that officers lacked probable cause to detain him on the basis of a coerced or manipulated identification, Moorer must show that defendants used a forbidden technique "to trick a person into making an unreliable identification." *Phillips*, 688 F.3d at 917. Or, Moorer must show that a jury could infer that the officers did not believe that the identifications were truthful. *See Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 377–78 (7th Cir. 2020).

Moorer argues that the identifications in his case were unreliable, overly suggestive, and that—because of gaps in the record about how he became a suspect, missing evidence, unfollowed leads, and evidence that pointed away from him—

defendants knew that the eyewitnesses were mistaken or lying when they identified him as being involved in the murder. *See* [163] at 36–45.[27] But the undisputed facts don't support these arguments, and no jury could find that defendants coerced or manipulated the witness identifications or otherwise had reason to know that Moorer wasn't involved in the murder or that the identifications were false.

1. *The Police Officers Were Not Required to Discount the Witnesses' Identifications*

By pointing out inconsistencies between the witnesses' identifications of Moorer and their earlier and later statements to detectives, *see* [163] at 16–18, 26–29, 40–41, Moorer challenges the eyewitnesses' credibility. *See Coleman v. City of Peoria, Illinois*, 925 F.3d 336, 351 (7th Cir. 2019). It's true that some of the witnesses' identifications don't line up with how they otherwise described the shooting and the suspect. For instance, Moorer had facial hair at the time of his arrest, *see* [154-42], but in their initial statements none of the witnesses described the first shooter as having a mustache. *See* [174] ¶¶ 3–4, 13, 16, 19, 21, 23; [164] ¶ 50.[28] The circumstances of the crime may also have made it hard for witnesses to see the suspect clearly: it was dark, *see* [164] ¶¶ 13–15, and the suspect had a mask on for

---

[27] Defendants Fanning, Leal, Spanos, Becker, Folino, Benigno, and Szwedo were not personally involved in the alleged violation of Moorer's rights, and summary judgment is entered in their favor on that basis. *See* notes 3, 4, 15, 22, and 24 above. Defendants Valkner, Tedeschi, Gonzalez, Cardo, McDermott, and the City of Chicago remain at issue for the Fourth Amendment claim.

[28] Other inconsistencies include: (1) Rivera described the masked shooter as having dreadlocks, even though Moorer didn't at the time she viewed the lineup, [164] ¶ 93, and (2) Kindelan said she didn't see anyone holding a gun, but identified Moorer as having held one during the crime. *Id.* ¶ 96.

much of the encounter. *See id.* ¶¶ 13, 22.[29] But these inconsistencies and challenges to perception didn't make the witnesses so unreliable that the officers could not believe them. *See Hart v. Mannina*, 798 F.3d 578, 591 (7th Cir. 2015) ("In real-world investigations, police often confront the limits of human memory and facial recognition."); *Woods v. City of Chicago*, 234 F.3d 979, 997 (7th Cir. 2000) (facts that diminished the credibility of a criminal complaint weren't enough to render that report incredible as a matter of law); *Johnson v. Acevedo*, 572 F.3d 398, 405 (7th Cir. 2009) (citation omitted) (eyewitness failure to include facial hair in an initial description was minor discrepancy affecting credibility but not destroying validity of identification testimony). It's undisputed that the eyewitnesses were at the scene of the crime, saw a man committing crimes, and personally identified Moorer as that man. There's no evidence that the witnesses had a grudge against Moorer, and their accounts were not incredible as a matter of law. *See Coleman*, 925 F.3d at 351 (citing *Cairel v. Alderden*, 821 F.3d 823, 835 (7th Cir. 2016)).

## 2. *There Is No Evidence that the Identifications Were Coerced or Manipulated*

Moorer offers a long list of reasons why both the in-person and photo array lineups in his case were overly suggestive or unreliable, and therefore not a suitable basis for probable cause. *See* [163] at 36–45.

---

[29] Moorer's expert witness noted that poor viewing conditions would have made it difficult for the eyewitnesses to see the suspect, the gun and stress would have distracted the witnesses from the appearance of the offender, the eyewitnesses' attention was divided among multiple offenders, the event took place in a short period of time, and cross-racial identification may have made accurate identification more difficult. [174] ¶¶ 72–76.

First, Moorer argues that the fillers in both the array and lineups didn't match the described weight of the offender. *See* [163] at 38. Some of the witnesses said the suspect was between 180-250 pounds, *see* [174] ¶¶ 3–4, 7, 21, 23, but not all of the witnesses estimated the masked man's weight. *See id*. ¶¶ 13, 16, 19. The demographics of the fillers in the in-person lineups weren't recorded, *see* [164] ¶ 85, but it's reasonable to infer that they were smaller than the 250-pound estimate given by some of the eyewitnesses. *See* [154-38]; [154-42]. The fillers in the photo array all weighed between 175-195 pounds, *see* [154-36], and were therefore lighter than the description given by three of the eyewitnesses, but fit the lower end of the description. *See* [174] ¶¶ 3, 7, 21, 23.

An examination of the photographs and the demographics of the photo array fillers shows lineups of men reasonably similar in weight to the suspect witnesses described. *See* [154-36]; [154-38]; [154-42]. In other words, the discrepancies in size between the fillers in both the array and in-person lineups and the description given by some of the eyewitnesses wasn't so great as to make the array and lineups overly suggestive. *See United States v. Curry*, 187 F.3d 762, 769 (7th Cir. 1999) (quoting *United States v. Funches*, 84 F.3d 249, 253 (7th Cir. 1996)) (participants in a lineup must have "descriptive features within a reasonable range of similarity to each other").[30] Similarly, the deviation from the eyewitness descriptions does not support

---

[30] Police best practices suggest that defendants should have selected fillers who "generally fit the witness[es'] description of the perpetrator," but that "when the description of the perpetrator differs significantly from the appearance of the suspect, fillers should resemble the suspect in significant features." U.S. Department of Justice, Technical Working Group for Eyewitness Evidence, *Eyewitness Evidence: A Guide for Law Enforcement* 29 (October 1999).

an inference that the officers chose the fillers in an intentional effort to produce an identification they knew to be incorrect.

Moorer's related argument that the photo array isn't a reliable source of probable cause because he appeared to be the largest person also fails. *See* [163] at 37–38; *United States v. Traeger*, 289 F.3d 461, 474 (7th Cir. 2002) (citing *United States v. Moore*, 115 F.3d 1348, 1361 (7th Cir. 1997)) (police officers conducting lineups are required to make "reasonable efforts under the circumstances to conduct a fair and balanced presentation," not "search for identical twins in age, height, weight, or facial features"). It's debatable whether Moorer appears to be the largest person in the photo array. *See* [154-36]. His height and weight according to the array demographics was close to that of the fillers, *see id.*, but he actually weighed significantly more—235–245 pounds—at the time the photograph was taken. *See* [174] at 1.[31] If Moorer did appear larger than the other participants in the photo array, however, the difference between Moorer and the fillers was not so great as to create an overly suggestive lineup under due process standards. *See Traeger*, 289 F.3d at 474 (lineup wasn't suggestive where suspect was larger than other participants); *Funches*, 84 F.3d at 253 (lineup wasn't unduly suggestive where suspect was three-to-five inches shorter and twenty-to-forty-five pounds lighter than other lineup participants). And even at this stage of the case where inferences are drawn in Moorer's favor, the weight or size differential is not evidence from which a jury could

---

[31] Moorer hasn't offered any evidence that police officers were aware of Moorer's actual weight at the time the photograph was taken. *See* [174] ¶ 1.

conclude that the officers designed the lineup to trick the eyewitnesses into picking Moorer or that the officers knew he was not reasonably suspected of the crime. *See also* below at 32–38.

Moorer next argues that the photo array can't be relied on because the top three fillers appeared bald even though no witness described the offender that way. *See* [163] at 38. While the photograph of one of the men in the array is so light as to make identifying facial features impossible, the five other men in the array (including Moorer) have either short hair or none at all. *See* [154-36]; [154-37]. Given that only one of the witnesses had described the perpetrator's hairstyle, [174] ¶ 19, which didn't match Moorer's hair or that of any of the fillers, it wasn't suggestive to include bald men in the array because most of the witnesses hadn't identified any particular hair style for the suspect. *See United States v. Galati*, 230 F.3d 254, 260 (7th Cir. 2000) (finding that insubstantial differences in hair style did not make an array overly suggestive where the men pictured "all fit the general descriptions" offered by the witnesses); *United States v. Gonzalez*, 863 F.3d 576, 585 (7th Cir. 2017) (photo array was suggestive where only a suspect and one other man in the array matched the witness's description of a particular hairstyle).

That Moorer wore a dark shirt didn't make the in-person lineups an unreliable source for probable cause, either. *See* [163] at 37. In general, identifications aren't overly suggestive where a suspect wears an article of clothing associated with the description given by witnesses. *See, e.g., Coleman v. Alabama*, 399 U.S. 1, 6 (1970); *United States v. Williams*, 522 F.3d 809, 810–11 (7th Cir. 2008). Here, Moorer wasn't

the only person wearing a dark shirt in the initial in-person lineup, seen by five of the witnesses. *See* [154-38]. Only some of the witnesses described the attacker as having worn a black shirt, *see* [174] ¶¶ 3–4, 7, 13, 16, 19, 21, 23, and Moorer wore a shirt with lettering on it for the lineups, *see* [154-38]; [154-42], which isn't how any of the witnesses described the suspect. None of the witnesses who identified Moorer in the in-person lineups said they did so because of what he was wearing. [164] ¶¶ 60, 68.

Moorer also argues that the in-person lineups were unreliable because he was the only person who appeared in both the photo array and the in-person lineups (conducted within days of the photo array). *See* [163] at 37–38; [164] ¶¶ 68, 92–97. The problem for Moorer here is that, although suggestive, this is not a forbidden practice. So the photo array could still be considered when evaluating probable cause. *See United States v. Sanders*, 708 F.3d 976, 989 (7th Cir. 2013) (quoting *United States v. Griffin*, 493 F.3d 856, 865 (7th Cir. 2007)) ("[T]here is nothing per se impermissible about placing the same suspect in two different identification procedures."). Absent some evidence to suggest that Moorer's repeated appearance in different identification procedures was designed to have him selected or that the officers did not genuinely suspect him, the lineup identifications could support probable cause in his case.

On that front, Moorer does challenge the identifications on the basis of allegedly coercive or manipulative conduct by some of the CPD defendants. *See* [163] at 37–39. If a police officer coaches a witness by leading them to identify a particular

person, that identification cannot provide probable cause. *See Hart v. Mannina*, 798 F.3d 578, 588 (7th Cir. 2015); *Phillips v. Allen*, 668 F.3d 912, 917 (7th Cir. 2012). On this basis, Moorer challenges photo array identifications made by Edwin and Kindelan, and the in-person identification made by Miguel. *See* [163] at 38–39.

Before the identifications, each of the witnesses was presented with and signed an advisory form explaining that a suspect wouldn't necessarily be in the array or lineup and that the witness wasn't required to make an identification. *See* [164] ¶¶ 61–63, 87–88. And the witnesses weren't told who to identify or where Moorer was in the array or lineup. *Id*. ¶¶ 65, 91.

After Edwin initially identified Moorer's photograph from the results of the nickname search, detectives asked him if a separate photograph of Moorer was "the person that you picked," and then had Edwin sign that printout. *See* [174] ¶ 32. It's reasonable to infer, as plaintiff suggests, that the second printout of Moorer's photograph was, in fact, the photo array. *See id*.; [164] ¶¶ 56, 67; [154-37] at 4. CPD officers appear to have used the photo array to confirm Edwin's initial identification, which he made minutes before from among the results of the nickname search.[32] Asking Edwin to confirm his identification wasn't a separate, coercive identification,

---

[32] While that initial identification from among database results may not have followed best practices, police officers didn't use an already forbidden identification technique by showing Edwin the results of the nickname search. *See Coleman v. City of Peoria, Illinois*, 925 F.3d 336, 348 (7th Cir. 2019) (citation omitted) (an officer's "cold search" on a database that led to photographs of a plaintiff along with more than 100 other possible suspects "may not have followed best practices" but wasn't suggestive under the Due Process Clause); *United States v. Jones*, 454 F.3d 642, 649 (7th Cir. 2006) (citation omitted) ("For the most part ... suggestive procedures involve the repeated presentation of only one suspect by the police to a witness, or a lineup in which the suspect is clearly distinguishable.").

and no one told Edwin who to identify among the many initial photographs that he was given. *See* [164] ¶ 56; [174] ¶ 31; *Phillips*, 668 F.3d at 917 (indicating that presenting a witness just one photograph and asking him to identify the culprit is impermissible).[33] Even if Edwin's viewing of the photo array as instructed by detectives was a separate, coerced identification, the use of the forbidden technique of telling Edwin who to identify doesn't taint all the other identifications in the case; it just means that police officers weren't entitled to rely on Edwin's photo array identification to establish probable cause. Edwin still identified Moorer from the larger group of photos, before he was prompted to confirm the identification, and other eyewitnesses identified Moorer independently of Edwin. *See Hart*, 798 F.3d at 590 (finding that circumstantial evidence concerning one coerced identification would need to be "compelling" in order to permit a reasonable inference that other identifications were also coached or manipulated).

Defendants didn't coerce Kindelan's photo array identification by documenting her choice, either. After Kindelan identified Moorer, detective Leal circled Moorer's photograph on Kindelan's copy of the array in order to verify her identification. [164] ¶ 66. The officers didn't coach or manipulate Kindelan because Leal documented an identification that the witness had already made; he didn't tell Kindelan who to pick out. *See id*.

---

[33] A proper documentation for that initial identification, as Moorer argues, would have required defendants to also preserve the database results that Edwin viewed. *See* [163] at 41.

Miguel said that detectives, calling him into the station to view the in-person lineup, told him that a suspect had been arrested and that it was the person he had identified in the photo array. *See* [164] ¶ 88. Conducting the lineup after priming the witness in this way was suggestive, because telling Miguel that the person he had previously identified had been arrested was likely to push the witness into identifying that person in a subsequent lineup. *See United States v. Jones*, 454 F.3d 642, 649 (7th Cir. 2006) (citing *Gregory-Bey v. Hanks*, 332 F.3d 1036, 1045 (7th Cir. 2003); *United States v. Traeger*, 289 F.3d 461, 473–74 (7th Cir. 2002)) (suggestive procedures are those "that have been orchestrated to yield the identification of one particular suspect"). The suggestiveness of Miguel's in-person lineup identification meant that it couldn't contribute to probable cause; but Miguel's earlier photo array identification could. *See* [164] ¶ 68. And there's no basis from which to infer that the other identifications in this case were similarly tainted. *See Hart*, 798 F.3d at 590. In other words, that Miguel's in-person identification was suggestive isn't a basis for liability under the Fourth Amendment, which depends on the existence of probable cause. *See Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 919 (2017); *Phillips*, 668 F.3d at 917.

The techniques and procedures officers used during the array and lineups fell below the standards prescribed by police best practices. Department of Justice guidelines suggest moving a suspect's position in each lineup, *see* U.S. Department of Justice, Technical Working Group for Eyewitness Evidence, *Eyewitness Evidence: A Guide for Law Enforcement* 30 (October 1999), but the CPD defendants placed Moorer in the same position in the photo array given to all of the witnesses and in all but one

of the in-person lineups. [174] ¶ 88. It is reasonable to infer that the officers involved in the investigation also participated in the identifications, so they did not use a "double-blind" method wherein "the administering officer does not know who is and is not a suspect." *Hart v. Mannina*, 798 F.3d 578, 588 n.1 (7th Cir. 2015) (citations omitted).[34] Police officers conducting lineups should "[a]void saying anything to the witness that may influence the witness' selection," U.S. Department of Justice, Technical Working Group for Eyewitness Evidence, *Eyewitness Evidence: A Guide for Law Enforcement* 33–35 (October 1999), but that didn't always happen in this case.[35] However, procedural flaws like these do not necessarily establish police coercion or manipulation. *See Hart*, 798 F.3d at 588 ("[C]riticism of police methods does not by itself establish a constitutional violation."); *Askew v. City of Chicago*, 440 F.3d 894, 896 (7th Cir. 2006).[36]

---

[34] Plaintiff also argues that the lineups were defective because officers didn't record how confident the witnesses were in their identifications, *see* [163] at 16, 31, but doesn't cite any evidence showing that defendants failed in this way. *See* [174] ¶ 98. Moorer claims that the independence of the identifications was tainted because some of the witnesses sat together at the police station before viewing the in-person lineup. *See* [163] at 30–31; [174] 89. But the witnesses viewed the lineup independently of one another and waited in separate rooms until all of the other witnesses had finished. [164] ¶¶ 89–90.

[35] Before viewing the photo array, Hernandez said that police officers told her to "pick out who I seen." [164] ¶ 64. And during Edwin's viewing of the in-person lineup, he indicated that a second person involved in the shooting might be in the lineup, but officers told him to focus only on the man he knew as Boom. *Id.* ¶ 94. Neither of these instructions made the subsequent identifications unreliable as a source of probable cause because officers didn't tell the witnesses which individual to choose. *See Phillips v. Allen*, 668 F.3d 912, 917 (7th Cir. 2012).

[36] Plaintiff's citations to *Sanders v. City of Chicago Heights*, Case No. 13 C 0221, 2016 WL 2866097 (N.D. Ill. May 17, 2016) aren't helpful because that case, centering on the Due Process Clause, didn't involve a Fourth Amendment claim or identify a specific forbidden identification technique. *Kuri v. Folino*, 409 F.Supp.3d 626 (N.D. Ill. 2019) is distinguishable because that decision involved post-trial motions under Rules 50, 59, and 60, not Rule 56. In

Moorer hasn't pointed to any constitutionally forbidden technique that defendants used in order to coerce or manipulate every eyewitness into identifying him, and the bulk of the identifications were not so tainted, suggestive, or unreliable that they couldn't support the probable cause defendants needed to detain Moorer. *See Phillips v. Allen*, 668 F.3d 912, 915 (7th Cir. 2012); *Hart*, 798 F.3d at 587.

3. *Other Procedural Problems, Missing Evidence, and Exculpatory Evidence*

Although imperfect or even shoddy as an evidence-gathering technique, the identification procedures used here did not require the officers to eliminate Edwin's initial identification or Martinez's lineup pick of Moorer from the probable cause assessment; and at a minimum, separately and as corroboration of each other, those two identifications established probable cause to believe Moorer committed a crime. But if defendants nonetheless knew or should have known that Moorer wasn't guilty, the officers couldn't rely on otherwise valid identifications. *See Hart v. Mannina*, 798 F.3d 578, 591 (7th Cir. 2015) (citations omitted) ("A police officer is permitted to rely on information provided by an eyewitness as long as the officer reasonably believes the witness is telling the truth."); *Reynolds v. Jamison*, 488 F.3d 756, 765 (7th Cir. 2007) (citations omitted) (an officer can rely on the complaint of a single witness to establish probable cause "unless the officer has a reason to question the witness' account"). Citing gaps in the record as to how he became a suspect, the loss of the

---

that case, evidence suggested that officers manipulated or fabricated identifications, and without the identifications, the court found that a jury's verdict that defendant officers lacked probable cause was not against the manifest weight of the evidence. *Id.* at 647.

victim's cell phone, exculpatory evidence, and failure to follow leads, Moorer claims that's what happened here: defendants knew or should have known that he was innocent and so they had reason to doubt the identifications. *See* [163] at 41–45.[37]

Moorer is right that it's not entirely clear how he became a suspect. Edwin played the central role in first identifying Moorer,[38] but it's unclear which CPD officer ran the nickname search, how many results that search turned up, or why Moorer's photograph in particular was included in the images shown to Edwin. *See* [164] ¶ 55; [174] ¶¶ 24–26, 28. Police officers failed to save the nickname search that turned up Moorer's image, and also failed to preserve records of the initial photo array that Edwin viewed. *See* [174] ¶¶ 28, 36. The timeline of events leading up to the photo array identifications doesn't make sense, either. Edwin's interview with detective Valkner (where it appears that he viewed the results of the nickname search for twenty to thirty minutes and then identified Moorer) is timestamped 1:30 a.m., and it generally took officers ten to twenty minutes to put together a photo array. *See* [174] ¶¶ 7, 30; [164] ¶¶ 53–55. But at 1:35 a.m., just five minutes later, Hernandez identified Moorer in a photo array. [164] ¶ 67.

---

[37] Moorer also argues that detective McDermott's racial bias undermines his credibility, but as noted above, none of the undisputed facts depend on McDermott's credibility and the objective evaluation of probable cause does not depend on the subjective reasons that McDermott (or any defendant) actually detained Moorer. *See Young v. City of Chicago*, 987 F.3d 641, 644 (7th Cir. 2021) (citations omitted).

[38] Edwin told detectives that the man who entered his apartment was named Boom and that Edwin had seen him before. [164] ¶ 53; [174] ¶¶ 7–8, 24. The name Boom led to a nickname search in a police database. [174] ¶ 24; [164] ¶¶ 55–56; [165-15] at 10–11. Detectives gave Edwin papers that included a picture of Thomas Moorer, along with photographs of other people. *See* [164] ¶ 56; [174] ¶ 31. After looking at the photographs for twenty to thirty minutes, Edwin identified Moorer as the assailant. [164] ¶ 56.

33

From these holes and discrepancies in the record, Moorer implies that a jury could fill the gaps with an inference that defendants set him up. But flawed policework is not a sufficient basis from which to draw that inference. *See Askew v. City of Chicago*, 440 F.3d 894, 896 (7th Cir. 2006) (police failure to follow correct procedures is a normal occurrence not "sufficient to permit second-guessing and damages"); *Coleman v. City of Peoria, Illinois*, 925 F.3d 336, 348 (7th Cir. 2019) (describing a similar "cold search" for suspects in a database as police not following best practices). The initial array that Edwin viewed appears rushed, it was poorly documented, and police records don't explain the precise order of operations that night, but it's not reasonable to infer from those procedural flaws that detectives knew Moorer was innocent. *See Askew*, 440 F.3d at 896; *Hart*, 798 F.3d at 588 (finding no Fourth Amendment liability where police officers failed to follow correct procedures but there was no evidence that procedural flaws led to a constitutional violation). There's no evidence that the detectives were aware of Moorer until after Edwin identified him, and they didn't just hand Moorer's photograph to Edwin: they asked him to look through a series of mugshots, with Moorer's being one among many. *See* [164] ¶ 56. No jury could infer from that process that defendants knew Moorer wasn't the murderer.

Officers mishandled evidence, too. But the fact that defendants lost or destroyed Edward's cellphone doesn't show that they knew Moorer was innocent.[39]

---

[39] Plaintiff also claims that one of the reports documenting a witness statement is "missing." *See* [102] ¶ 23. Moorer is probably referring to Kindelan's interview with detective Leal, which wasn't recorded. *See* [174] ¶ 21; [164] ¶¶ 51–52. Moorer hasn't alleged anything to

Because the phone number associated with Boom continued to be used after Moorer was arrested, *see* [174] ¶ 12, it's reasonable to infer that Edward's missing phone contained evidence that could have supported Moorer's case (e.g., other evidence that could identify Boom as someone other than Moorer). But McDermott needed to preserve evidence that he *knew* was exculpatory, and he had a duty to not destroy exculpatory evidence in bad faith. *See Hart*, 798 F.3d at 589 (citing *Arizona v. Youngblood*, 488 U.S. 51, 58 (1998)). Plaintiff does not point to any evidence that McDermott knew the phone contained information that would exculpate Moorer,[40] or that McDermott destroyed it in bad faith, and the loss of the phone doesn't show that defendants knew Moorer was innocent. *See Hart*, 798 F.3d at 589 (rejecting an argument that the spoliation of evidence by police officers was a basis for liability under the Fourth Amendment where officers didn't destroy evidence recklessly or in bad faith).

Finally, Moorer argues that defendants had reason to doubt the identifications because evidence pointed away from him and defendants failed to adequately follow leads that would have shown he didn't commit the crime. *See* [163] at 42–44. The

---

indicate that the contents of that interview (which was documented in a separate scene report) should have shown officers that he was innocent, or suggested that it was destroyed in bad faith. *See* [163] at 9, 11–12.

[40] Plaintiff argues that the phone had known exculpatory value because (1) the phone referred to Boom, not Moorer's true nickname, Boomer; (2) the location of the phone associated with Boom didn't match up with Moorer's activities; and (3) because Edwin said that Boom had called or texted his brother prior to the murder. [163] at 50. It's reasonable to infer that McDermott knew the phone contained this evidence, but Plaintiff hasn't shown that this evidence was lost or concealed. It is not reasonable to infer that the phone had other undisclosed exculpatory evidence. And what was known about the phone was not so compelling that a jury could infer that McDermott did not genuinely believe the eyewitness after eyewitness who identified Moorer.

35

evidence that pointed away from Moorer at the time he was charged included: (1) Moorer's nickname was Boomer, not Boom, as indicated by a tattoo on Moorer's arm, [174] ¶ 48; (2) he didn't weigh as much at the time of his arrest as the man some of the witnesses had described, *see id.* ¶ 1; (3) detectives didn't find injuries on Moorer or blood on his clothing, *see id.* ¶ 52; (4) the phone number associated with Boom was known to be pinging at locations different from where Moorer lived or where his car was, *see id.* ¶¶ 46; and (5) Moorer's car didn't match the description of the offenders' vehicle. *Id.* ¶ 54.[41] Considering all of the facts and circumstances the officers were aware of, there was evidence that Moorer didn't commit the murder. But that evidence did not undermine defendants' probable cause to detain Moorer, which was based on identifications by seven different eyewitnesses. *See Coleman*, 925 F.3d at 351 (citation omitted) ("Where a reasonable person would have a sound reason to believe the suspect committed a crime, the police may arrest and allow the criminal justice system to determine guilt or innocence."); *Bridewell v. Eberle*, 730 F.3d 672, 676 (7th Cir. 2013) (citations omitted) (police officers determining whether probable cause exists aren't required to draw inferences in favor of a suspect); *Askew*, 440 F.3d at 896 (the Constitution "permits [police officers] to initiate the criminal process and leave the sifting of competing claims and inferences" to the judicial system).

---

[41] Moorer also argues that DNA evidence proved his innocence, *see* [163] at 18–20, 43–44, but that evidence was tested well after Moorer had been charged by the state's attorney, *see* [174] ¶ 65; [164] ¶¶ 121–22, and so the DNA analysis couldn't have undermined defendants' probable cause at the time Moorer was detained.

Moorer argues that defendants didn't thoroughly investigate his case. *See* [163] at 42–43. He claims defendants should have conducted a gun-shot residue test, searched his home and car, investigated a second shooter, and interviewed alibi witnesses,[42] but the officers weren't required to do any of those things. *See BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir. 1986) (officers are required to pursue "reasonable avenues of investigation" and cannot ignore "facts that would help clarify the situation," but they are permitted to end their investigation once probable cause has been established).[43] Once the eyewitnesses in this case identified Moorer, defendants were entitled to rely on those identifications and were free to end their investigation. *See Williamson v. Curran*, 714 F.3d 432, 441 (7th Cir. 2013) (citations omitted) ("So long as an officer reasonably believes the putative victim of or eyewitness to a crime is telling the truth, he may rely on [that witness's statements] in deciding to make an arrest, without having to conduct an independent investigation into their accounts."); *Stokes v. Bd. of Educ. of the City of Chicago*, 599 F.3d 617, 624 (7th Cir. 2010) (citation omitted) ("While an officer may not close his or her eyes to clearly exculpatory facts,

---

[42] Plaintiff also argues that police officers manipulated reports to better fit Moorer's description, rather than the suspect's description as given by witnesses, *see* [163] at 8–9, 13, but no evidence supports that allegation. *See* [165-4] at 3; [165-6] at 3; [165-39] at 2.

[43] An officer "may not ignore conclusively established evidence of the existence of an affirmative defense," but the Fourth Amendment doesn't require police officers to investigate the validity of a defense. *Dollard v. Whisenand*, 946 F.3d 342, 355 (7th Cir. 2019) (quoting *McBride v. Grice*, 576 F.3d 703, 707 (7th Cir. 2009)). There was no conclusive evidence that Moorer wasn't at the scene of the shooting: officers weren't required to take Moorer's word for it, and they had no duty to talk to every person in Moorer's house in order to verify his whereabouts. Unlike *BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir. 1986), where officers had to continue to investigate because they lacked information on an essential element of a crime, defendants in this case had established probable cause on every element of the crime. *See id.* (citing *Gramenos v. Jewel Companies, Inc.*, 797 F.2d 432, 437–442 (7th Cir. 1986)).

the Fourth Amendment does not require an officer with probable cause to arrest to wait while pursuing further investigation.").

Defendants needed only a single eyewitness identification to supply probable cause. *Coleman v. City of Peoria, Illinois*, 925 F.3d 336, 346 (7th Cir. 2019) (citing *Hart v. Mannina*, 798 F.3d 578, 587 (7th Cir. 2015)). They had seven. *See* [164] ¶¶ 56, 68, 92–97, 106. Moorer has marshaled evidence to suggest that his detention was the product of subpar policework, but a jury could not conclude that defendants had reason to doubt the identifications, or to know that Moorer wasn't the murderer. The bulk of the identifications were a reliable source of probable cause, and defendants didn't know that Moorer was innocent. Defendants had probable cause to detain Moorer for murder.

### 4. *Proximate Cause*

Even if defendants lacked probable cause to detain Moorer, his Fourth Amendment claim would still face another challenge. To hold defendants liable under § 1983, Moorer needs to prove that defendants were the ones who caused a violation of his rights. *See Hoffman v. Knoebel*, 894 F.3d 836, 841 (7th Cir. 2018). He can't, and so his § 1983 claim fails for a lack of causation as well.

Section 1983 creates a form of tort liability for the deprivation of constitutional rights, privileges, or immunities. *Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 916 (2017) (citing *Imbler v. Pachtman*, 424 U.S. 409, 417 (1976)). But liability under § 1983 depends on a showing that the defendant's act was both "the cause-in-fact of the injury and its proximate cause." *Hoffman*, 894 F.3d at 841 (citing *Whitlock v.*

38

*Brueggemann*, 682 F.3d 567, 582 (7th Cir. 2012)). An indictment generally breaks the chain of causation between an unlawful arrest and § 1983 tort liability. *See Colbert v. City of Chicago*, 851 F.3d 649, 655 (7th Cir. 2017) (quoting *Reed v. City of Chicago*, 77 F.3d 1049, 1053 (7th Cir. 1996)) ("[T]he State's Attorney, not the police, prosecutes a criminal action ... [T]he chain of causation [between a wrongful arrest and post-indictment tort liability] is broken by an indictment, absent an allegation of pressure or influence exerted by the police officers, or knowing misstatements by the officers to the prosecutor."). To succeed on a § 1983 claim for unlawful pretrial detention against an arresting officer, Moorer must show "some postarrest action which influenced the prosecutor's decision to indict." *Id.* (quoting *Snodderly v. R.U.F.F. Drug Enf't Task Force*, 239 F.3d 892, 902 (7th Cir. 2001)); *see Young v. City of Chicago*, 987 F.3d 641, 645 (7th Cir. 2021) (allegations of police misconduct can undermine probable cause and support Fourth Amendment liability for unlawful pretrial detention); *Coleman v. City of Peoria, Illinois*, 925 F.3d 336, 351 (7th Cir. 2019) (citations omitted) (finding that the presumption of probable cause resulting from an indictment can be rebutted by "evidence that law enforcement obtained the indictment through improper or fraudulent means").

Moorer argues that defendants failed to tell the prosecuting attorney all of the relevant facts after the arrest, and that defendants revealed the timeline of the interviews and certain witness statements in supplemental reports only after charges had been brought. *See* [163] at 46–47. But the reports submitted after charges had been brought don't reveal anything about what the attorneys knew at the time of the

indictment. *See* [165-3]; [165-4]. And there's no evidence that the state's attorneys weren't aware of the procedures during the identifications, the timeline of identifications, the missing cellphone, the continued use of the phone number after Moorer was arrested, Moorer's lack of injuries, or the inconsistencies between Moorer's appearance and the descriptions given by the witnesses. *See* [164] ¶ 115.

The undisputed facts show that after the photo array identifications, the state's attorney came to the police station where she was updated on the investigation, reviewed police reports, and reinterviewed witnesses. *Id.* ¶ 73. After the in-person identifications, the state's attorney interviewed the six eyewitnesses who identified Moorer and two of Moorer's alibi witnesses, Vaneglen and Nobles. *Id.* ¶¶ 99, 111. Detectives Cardo, Gonzalez, and McDermott all testified that they never pressured the state's attorney or otherwise coerced her into approving the charges against Moorer. *Id.* ¶ 115.

There were flaws in the investigation, but it's not reasonable to infer from those flaws that the state's attorneys didn't know about aspects of the investigation or that a reasonable attorney in their position would have dropped the charges had they been aware. *See Armstrong v. Daily*, 786 F.3d 529, 553 (7th Cir. 2015) (discussing § 1983's causation requirement for a Due Process claim based on the destruction of exculpatory evidence). The state's attorneys knew about the progress of the investigation, interviewed the identifying and alibi witnesses, and weren't pressured or promised anything by police officers in exchange for indicting Moorer. *See* [164]

¶¶ 73, 99, 111, 115. Moorer hasn't offered any evidence that defendants influenced the attorneys' decision to indict. *See* [163] at 46–47.

Defendants had probable cause to detain Moorer before his trial. Alternatively, the grand jury's indictment severed the causal link between defendants' actions and Moorer's alleged injury.[44] Summary judgment is granted to defendants on the Fourth Amendment claim.

### B.    False Imprisonment

That defendants had probable cause to detain Moorer also defeats his state-law claim for false imprisonment. *See Poris v. Lake Holiday Prop. Owners Ass'n*, 368 Ill.Dec. 189, 203 (2013) (citing *Martel Enters. v. City of Chicago*, 223 Ill.App.3d 1028, 1034 (1st Dist. 1991)) ("Probable cause is an absolute bar to a claim for false imprisonment.").[45]

The false imprisonment claim also fails because it is time-barred. Illinois law requires that actions against "a local entity or any of its employees for any injury" be brought "within one year from the date that the injury was received or the cause of action accrued." 745 ILCS 10/8-101. A false imprisonment claim accrues when a

---

[44] Because the case can be decided on these grounds, I do not address the individual defendants' argument that they are entitled to qualified immunity on Moorer's Fourth Amendment claim. *See* [155] at 22.

[45] Having resolved the only federal claim, a district court ought to relinquish jurisdiction over supplemental state-law claims. *Burritt v. Ditlefsen*, 807 F.3d 239, 252 (7th Cir. 2015); *see* 28 U.S.C. § 1367(c). But the balance of judicial economy, convenience, fairness, and comity weighs in favor of a merits decision on state-law false imprisonment claim. *See Wright v. Associated Ins. Companies Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994). The finding of probable cause for the detention makes it clear how Moorer's false imprisonment claim must be decided, and the statute of limitations has also run.

plaintiff is held pursuant to a warrant or other judicial process. *See Nat'l Cas. Co. v. McFatridge*, 604 F.3d 335, 344 (7th Cir. 2010) (citing *Mercado v. Vill. of Addison*, 385 Ill.App.3d 1006 (2d Dist. 2008); *Smith v. Boudreau*, 366 Ill.App.3d 958 (1st Dist. 2006)); *Kitchen v. Burge*, 781 F.Supp.2d 721, 738 (N.D. Ill. 2011). Here, Moorer was indicted by the grand jury in September 2010, *see* [164] ¶¶ 116–120, and so he had until September 2011 to file his state-law false imprisonment claim. But his original complaint was filed on May 30, 2018, [1], which makes this claim untimely.[46]

Summary judgment is granted to defendants on the false imprisonment claim.

## C.    Spoliation of Evidence

Negligent spoliation of evidence is a type of negligence, not an independent tort. *See Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 509–510 (7th Cir. 2007); *Boyd v. Travelers Ins. Co.*, 166 Ill.2d 188, 192–193 (1995).[47] To show negligent spoliation, a plaintiff must prove that a defendant owed him a duty to preserve the evidence in question; a breach of that duty; an injury proximately caused by the breach; and actual damages. *See Borsellino*, 477 F.3d at 510; *Boyd*, 166 Ill.2d at 194–

---

[46] Moorer failed to make any arguments as to why his state-law false imprisonment claim wasn't barred by the statute of limitations. *See* [163]. He has forfeited any arguments in opposition to the statute of limitations defense. *See Salas v. Wisconsin Dep't of Corr.*, 493 F.3d 913, 924 (7th Cir. 2007) (citing *Witte v. Wisconsin Dep't of Corr.*, 434 F.3d 1031, 1038 (7th Cir. 2006)) (a nonmovant forfeits arguments it fails to raise in a brief opposing summary judgment).

[47] Considering the factors of 28 U.S.C. § 1367(c), it makes sense to retain jurisdiction over this state-law claim as well. The district court and the parties have already expended substantial judicial resources: litigation began more than three years ago, and the parties have completed discovery. *See Hansen v. Bd. of Trustees of Hamilton Se. Sch. Corp.*, 551 F.3d 599, 608 (7th Cir. 2008). This claim is based on McDermott's conduct during the investigation and is intertwined with the federal claim. The correct disposition is clear, and it serves judicial economy to decide the spoliation claim now.

195. Here, Moorer alleges that detective McDermott negligently destroyed evidence when he failed to preserve Edward Ramos's cellphone and a general progress report. *See* [102] ¶¶ 58–63; [163] at 49–51.[48]

There is no general duty to preserve evidence under Illinois law, but one may arise if the parties are sufficiently related and it was foreseeable that the evidence would be used in future litigation. *See Schaefer v. Universal Scaffolding & Equip., LLC*, 839 F.3d 599, 609 (7th Cir. 2016). Moorer argues that McDermott owed him a duty to preserve evidence because proper police practices required detectives to document and inventory evidence, [163] at 49, but standard police practices aren't enough to show a duty under Illinois law. *See Schaefer*, 839 F.3d at 609; *Boyd*, 166 Ill.2d at 195. Moorer's lawyers never asked McDermott to preserve the evidence and McDermott didn't segregate the evidence for Moorer's benefit. *See Boyd*, 166 Ill.2d at 195; *Martin v. Keeley & Sons, Inc.*, 365 Ill.Dec. 656, 665 (2012). McDermott never voluntarily undertook a duty to preserve the evidence for Moorer, either. *See Martin*,

---

[48] Moorer also brought his spoliation claim against "other unknown defendants." [102] at 10. Moorer failed to identify those defendants during discovery, however, and so the unknown defendants are dismissed from the case. *See Williams v. Rodriguez*, 509 F.3d 392, 402 (7th Cir. 2007); Fed. R. Civ. P. 21 ("On motion or on its own, the court may at any time, on just terms, add or drop a party."). Defendants argue that Moorer's spoliation claim is time-barred. [155] at 44–45. Under Illinois law, Moorer had one year from the date that his cause of action accrued to file suit. *See* 745 ILCS 10/8-101(a). For most torts, the cause of action accrues when the plaintiff suffers injury, but the discovery rule delays commencement of the relevant statute of limitations until the plaintiff knows or reasonably should know that he has been injured and that his injury was wrongfully caused. *Hermitage Corp. v. Contractors Adjustment Co.*, 166 Ill.2d 72, 77–78 (1995) (quoting *Jackson Jordan, Inc. v. Leydig, Voit & Mayer*, 158 Ill.2d 240, 249 (1994)). When Moorer should have discovered the missing evidence in this case is generally a question of fact, *see Jackson*, 158 Ill.2d at 250 (citation omitted), and it's not clear that he should have learned about the missing phone during his criminal trial. Moorer's spoliation claim isn't clearly time-barred, and so summary judgment on the basis of the statute of limitations isn't appropriate.

365 Ill.Dec. at 662 (finding that a showing of voluntary undertaking requires that a plaintiff demonstrate "affirmative conduct by [defendant] showing [his] intent to voluntarily undertake a duty" to the plaintiff). The law—the Due Process Clause of the Fourteenth Amendment—does impose a duty on police officers to preserve some evidence, but officers breach that duty only in a narrow set of circumstances. *See United States v. Cherry*, 920 F.3d 1126, 1140 (7th Cir. 2019) (quoting *United States v. Fletcher*, 634 F.3d 395, 407 (7th Cir. 2011)).

Assuming that the Due Process Clause can support a duty to preserve evidence under Illinois law, Moorer's claim fails because he hasn't shown a breach. Moorer agrees that the standard of care applicable to McDermott is that for an Illinois police officer solely engaged in law enforcement, *see* [163] at 49, and McDermott is liable only if he lost or destroyed the evidence in a willful and wanton way. 745 ILCS 10/2-202; *Fitzpatrick v. City of Chicago*, 112 Ill.2d 211, 214 (1986). Willful and wanton conduct "means a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." 745 ILCS 10/1-210; *see McDowell v. Vill. of Lansing*, 763 F.3d 762, 768 (7th Cir. 2014) (quoting *Geimer v. Chicago Park Dist.*, 272 Ill.App.3d 629 (1st Dist. 1995)) ([willful] and wanton conduct "means more than mere inadvertence, incompetence, or unskillfulness").

It's not clear which general progress report Moorer alleges that McDermott lost, *see* [102] ¶¶ 23, 59, but it seems likely Moorer means the report from an initial interview with Kindelan. *See* [163] at 11. Moorer doesn't allege any connection

44

between McDermott's conduct and the absence of that report, and the parties agree that Leal never made a report summarizing that interview. *See* [164] ¶ 52. Because there was no report to preserve and McDermott wasn't involved in the interview, McDermott didn't breach any duty to Moorer involving that general progress report.

As for the cellphone, McDermott requested that the forensic investigator turn over Edward Ramos's phone to him, rather than inventory it, and the investigator gave McDermott the phone. [164] ¶ 47; [174] ¶ 66. After that, the cellphone disappears from the record. [174] ¶ 67; [164] ¶ 71. McDermott said that he or someone else should have documented and inventoried it, [174] ¶ 67, but there's no evidence that McDermott intentionally lost or destroyed the evidence or acted with conscious disregard for Moorer's safety. While it's reasonable to infer that Edward's missing phone contained evidence that could have supported Moorer's case, that doesn't mean that McDermott destroyed the phone in a willful or wanton way. At most, the undisputed facts show that McDermott was inadvertent or incompetent in his handling of the evidence, and that's not enough to show negligent spoliation under Illinois law. *See* 745 ILCS 10/1-210; *McDowell*, 763 F.3d at 768.

Summary judgment is granted to defendant McDermott on the spoliation claim.

## IV. Conclusion

Thomas Moorer spent years in pretrial detention based on eyewitness identifications that were of questionable reliability. He was acquitted at trial. Moorer understandably seeks recompense for his pretrial detention, but because probable

45

cause is a low bar, the Fourth Amendment did not prohibit the officers from relying on the identifications and letting the lawyers, judge, and jurors resolve Moorer's guilt. Without any evidence to suggest that defendants knew the identifications were wrong or that the officers were the legal cause for detention after the prosecutor, grand jury, and court weighed in, a civil lawsuit under the Fourth Amendment simply does not lie.

Defendants' motion for summary judgment, [153], is granted. Enter judgment and terminate civil case.

ENTER:

Manish S. Shah
United States District Judge

Date: December 20, 2021